THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | **MEMORANDUM DECISION AND ORDER DENYING [35] DEFENDANT'S MOTION TO SUPPRESS** |
|---|---|
| Plaintiff, | |
| v. | Case No. 2:18-cr-00288-DBB |
| BEVERLY LYNN DAVIES, | District Judge David Barlow |
| Defendant. | |

Before the court is Defendant's motion to suppress statements.[1] Defendant seeks to suppress statements made to police during an interrogation and search of her house on May 30, 2018.[2] Because Defendant made a knowing and voluntary waiver of her *Miranda* rights, Defendant's motion is DENIED.

## BACKGROUND

In 2016, Special Agent Christian Mickelsen opened an investigation into a marijuana trafficking ring in California, Utah, Oklahoma, and Massachusetts.[3] Agent Mickelsen arrested four major participants in the conspiracy who confirmed Beverly Davies as a source of marijuana in California.[4] The government filed charges against Ms. Davies and lis pendens against her two properties in California.[5]

---

[1] Def's Mot. to Suppress Statements, ECF No. 35; Def's Mem. in Support, ECF No. 93; United States' Opp. to Mot. to Suppress, ECF No. 97.
[2] ECF No. 93, at 2, 4.
[3] ECF No. 97, at 3.
[4] ECF No. 93, at 3-4.
[5] *Id.* at 4.

On May 30, 2018, approximately 16 agents, including Mickelsen and Detective Brad Dorr, executed a search warrant on Ms. Davies's residence in Coarsegold, California.[6] The agents handcuffed Davies and, after seating Davies at a table in the living room, Mickelsen and Dorr led Davies to a bedroom for questioning.[7] At this point, Mickelsen began explaining to Ms. Davies the nature and severity of the charges against her:

> DAVIES: Are we under arrest today?
>
> SA Mickelsen: You are under arrest, Yes.
>
> DAVIES: For?
>
> SA Mickelsen: For distribution of marijuana.[8]

Mickelsen also emphasized the evidence against Davies and that her coconspirators were cooperating against her:

> SA Mickelsen: I have a federal arrest warrant for you. Those guys were charged federally. And they were . . . charged with a ten year mandatory minimum. And guess what? They don't want to do ten years in prison. So you know what? They are cooperating with me. Every . . . every last one is cooperating.[9]
>
> . . .
>
> SA Mickelsen: . . . they're gonna get a break if they cooperate against you so I want to talk to you because I know you didn't grow twenty-two hundred pounds . . .[10]

---

[6] ECF No. 97, at 4-5.
[7] *Id.*
[8] Ex. 5, Transcript of May 30, 2018 interview recordingat 1.
[9] Ex. 5, Tr. at 2.
[10] *Id.*

Ms. Davies continually attempted to interject and explain her side of the story, but Mickelsen clarified that he had to read her *Miranda* rights.[11] He did so, and Dorr checked to see if Ms. Davies understood her rights:

> Det. Dorr: But first of all Bev . . . do you understand your rights?
>
> DAVIES: I have the right to an attorney. So, I need an attorney. Is what I need.
>
> . . .
>
> SA Mickelsen: Okay. So you want your attorney? You don't want to answer questions? Is what you're telling me? It's up to you. . .
>
> DAVIES: I don't have an attorney.[12]

Ms. Davies attempted to keep explaining her involvement in the conspiracy, but Dorr stopped her again to clarify that she understood her rights:

> Det. Dorr: Bev, Bev, listen, listen. First of all do you understand your rights?
>
> DAVIES: Okay. Maybe you ought to read them to me again. Cause you know I'm—
>
> Det. Dorr: Yeah. Okay. Listen.
>
> DAVIES: . . . I'm mind boggled right now.[13]

Dorr then reread Ms. Davies her *Miranda* rights, and Ms. Davies affirmatively acknowledged that she understood her rights.[14] She made another statement that Dorr attempted to clarify:

> DAVIES: I . . . I . . . I . . . can't say anything anymore. I . . . I just am . . . I'm . . . I'm befuddled.

---

[11] Ex. 5, Tr. at 4
[12] *Id.*
[13] *Id.*
[14] Ex. 5, Tr. at 5.

> Det. Dorr: So basically you don't want to talk and you're gonna want an attorney right?
>
> DAVIES: Well don't you think I should get an attorney?
>
> Det. Dorr. It's not what I think. . .[15]

After further hesitation about whether she should get an attorney, Ms. Davies made the following statement, which the officers understood as her invoking her right to counsel:

> DAVIES: Well I want both. I'd  . . . I'll answer your questions but I still think I need an attorney.
>
> SA Mickelsen: Okay.
>
> DAVIES: I . . . I meant . . .
>
> SA Mickelsen: Let's . . .
>
> DAVIES: I didn't . . .
>
> SA Mickelsen: Well that's fine.
>
> Det. Dorr: We can't talk to you. We can't talk to you.
>
> SA Mickelsen: Yeah. Yeah. Yeah.
>
> DAVIES: Oh. Okay. Well let me talk to you then.
>
> SA Mickelsen: No. Let's . . .
>
> DAVIES: I don't know . . . if I can talk to you today do I go to jail?[16]

Mickelsen explained that Ms. Davies was going to jail either way and repeated the charges against her.[17] He also informed Ms. Davies that the government had filed civil actions to seize her two properties, at which point Ms. Davies attempted to revoke her invocation of the

---

[15] *Id.*
[16] Ex. 5, Tr. at 6.
[17] *Id.*

4

right to counsel.[18] Mickelsen explained that he would have to call the prosecutor to get legal advice, but first identified each individual coconspirator that was cooperating against Davies.[19] The officers then let Davies step outside to smoke a cigarette while Mickelsen called the prosecutor.[20] When the interrogation resumed, the officers advised Ms. Davies of her *Miranda* rights for the third time, and Ms. Davies signed a waiver of her rights.[21] Ms. Davies went on to make incriminating statements.

## STANDARD

In *Miranda v. Arizona*, the Supreme Court found that the Fifth Amendment prohibition against self-incrimination requires police to administer certain warnings and notices of rights to individuals in custody before interrogation.[22] After the administration of *Miranda* warnings, interrogation may only continue if the accused validly waives his rights and responds to interrogation.[23] If an individual being interrogated requests counsel then "the interrogation must cease until an attorney is present."[24] But the individual "must unambiguously request counsel."[25] Requests that are equivocal and would leave a reasonable officer thinking only that "the suspect *might* be invoking counsel" do not require the officers to stop their questioning.[26] If the accused invokes her right to counsel, a valid waiver can only be established if the accused herself reinitiates further communications with the police.[27]

---

[18] Ex. 5, Tr. at 7.
[19] Ex. 5, Tr. at 7-8.
[20] Ex. 5, Tr. at 8.
[21] Ex. 5, part 2,  at 3.
[22] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).
[23] *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).
[24] *Id.* at 474.
[25] *Davis v. United States*, 512 U.S. 452, 459 (1994).
[26] *Id*.
[27] *Id.* at 484–85.

Case 2:18-cr-00288-DBB   Document 102   Filed 08/23/21   PageID.437   Page 6 of 17


Although the proponent of a motion to suppress bears the general burden of proof,[28] if the government asserts waiver of *Miranda* rights then it must prove the waiver by a preponderance of the evidence.[29] Waiver is only effective if the totality of the circumstances show both an uncoerced choice and that the suspect understood the rights that she was waiving.[30]

## ANALYSIS

The resolution of Ms. Davies's motion to suppress turns on three issues. First, when Ms. Davies invoked her Fifth Amendment right against self-incrimination. Second, if Ms. Davies reinitiated conversation with the officers after invoking her right to counsel. And third, if Ms. Davies validly waived her *Miranda* rights.

### A. Ms. Davies's statements following the first and second readings of her *Miranda* rights were ambiguous or equivocal and insufficient to invoke her right to counsel.

As noted earlier, an accused's invocation of the right to counsel must be unambiguous.[31] This is an objective test that requires a statement sufficiently clear such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[32] If a suspect makes a reference to an attorney that is ambiguous or equivocal then an officer may continue interrogation.[33] In *Davis*, the Court held that "maybe I should talk to a lawyer" was an ambiguous statement that did not merit cessation of interrogation.[34] Under the *Davis* standard the umbrella of equivocal statements is broad—courts have held that examples of ambiguous statements that are not sufficient to invoke the right to counsel include: asking the interrogating

---

[28] *United States v. Ringold*, 335 F.3d 1168, 1171 (10th Cir. 2003).
[29] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).
[30] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[31] *Davis v. United States*, 512 U.S. 452, 459 (1994).
[32] *Id.*
[33] *Id.*
[34] *Id.* at 462.

officers whether or not the suspect needs an attorney;[35] stating "if that's the case, then – then I might want to talk to my attorney" after being confronted with evidence;[36] and asking "[c]an I speak to [my attorney]?"[37]

In contrast, statements that are unambiguous and sufficient to invoke the right to an attorney or to remain silent include: handing an agent a letter from an attorney stating the accused "does not wish to speak with you without counsel;"[38] responding "no" to the question "[d]o you want to talk to me about this stuff?"[39] and stating "I'm gonna get an attorney."[40]

In this case, there are three instances during the interrogation in which Ms. Davies now alleges that she invoked her right to counsel or right to remain silent. First, after the first reading of her *Miranda* rights, Ms. Davies stated "I have the right to an attorney. So, I need an attorney. Is what I need."[41] Second, after the second reading of her rights, Ms. Davies stated "I . . . I . . . I can't say anything anymore. I . . . I just am . . . I'm . . . I'm befuddled."[42] Finally, Ms. Davies stated "Well I want both. I'd . . . I'll answer your questions but I still think I need an attorney."[43]

---

[35] *Mitchell v. Gibson*, 262 F.3d 1036, 1056 (10th Cir. 2001) ("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under *Davis*.").

[36] *United States v. Zamora*, 222 F.3d 756, 766 (10th Cir. 2000) ("Furthermore, the agents testified that when Zamora made the statement he seemed to be thinking aloud. Under these circumstances, we agree with the district court that Zamora's statement was equivocal.").

[37] *United States v. Nafkha*, No. 96-4130, 1998 WL 45492, at *3 (10th Cir. 1998) (unpublished) ("We do not think Mr. Nafkha was sufficiently clear. We think the officers reasonably believed that he was not asking to speak with his attorney, but rather asking whether he had that right.").

[38] *United States v. Santistevan*, 701 F.3d 1289, 1292–93 (10th Cir. 2012) ("We agree with the district court, and find this language to be the 'level of clarity' that *Davis* requires.")

[39] *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004) ("There is no nuance nor context to vary the unequivocal meaning of Rambo's single word, monosyllabic response. His response, 'No,' could only mean an invocation of his right to remain silent.").

[40] *Stemple v. Workman*, No. 01-cv-166-GKF-PJC, 2009 WL 1561566, at *16 (N.D. Okla. 2009) ("Stemple's last statement, 'I'm gonna get an attorney,' is unequivocal and the interrogating officer ceased questioning as required under *Davis*.").

[41] ECF No. 97, at 9; Ex. 5, Tr. at 4.

[42] ECF No. 97, at 11; Ex. 5, Tr. at 5.

[43] ECF No. 97, at 12; Ex. 5, Tr. at 6.

The government concedes that this third statement was an invocation of Ms. Davies's right to counsel.[44] Thus, the only question is if Ms. Davies's statements following the first and second readings of her *Miranda* rights were sufficiently unambiguous to invoke her right to counsel or right to remain silent.

Defendant contends that her first statement, "I have the right to an attorney. So, I need an attorney. Is what I need," was an unequivocal invocation of her *Miranda* rights.[45] In response, the government argues that Ms. Davies was not asserting her right to an attorney but was instead thinking out loud.[46] After Ms. Davies made her first statement Agent Mickelsen attempted to clarify the situation, asking "So you want your attorney? You don't want to answer questions? Is that what you're telling me? It's up to you."[47] Ms. Davies responded "I don't have an attorney."[48]

Given the high standard imposed by *Davis*, Ms. Davies's first statement was not sufficiently unambiguous to invoke her right to counsel. Ms. Davies's first statement was not so clear that a reasonable officer would understand it to be a request for an attorney. Instead, Ms. Davies's first statement resembled the statement from the defendant in *Zamora*, in which the Tenth Circuit held that a statement was equivocal when the officers thought that the defendant was thinking out loud about acquiring an attorney.[49] Here, a reasonable officer would surmise that Ms. Davies was thinking out loud about hiring an attorney, not unambiguously invoking her right to one. Further, the officers here attempted to clarify her intent by asking follow-up

---

[44] ECF No. 97, at 47–48.
[45] ECF No. 93, at 14.
[46] ECF No. 97, at 43.
[47] ECF No. 97, at 9; Ex. 5, Tr. at 4.
[48] *Id.*
[49] *United States v. Zamora*, 222 F.3d 756, 766 (10th Cir. 2000).

questions about whether she wished to cease the interrogation and obtain counsel. Ms. Davies's response, "I don't have an attorney," certainly could not be construed as an unequivocal request for an attorney. Ms. Davies then follows that statement by volunteering "I don't know that much about those people [the alleged co-conspirators]." Contextually, this would reinforce a reasonable officer's understanding that she was not invoking the right to counsel, but instead wanted to talk. Ms. Davies's first statement was not the clear invocation of her right to counsel required by *Davis*.

Defendant next argues that her second statement "I . . . I . . . I can't say anything anymore. I . . . I just am . . . I'm . . . I'm befuddled" was an invocation of her right to remain silent.[50] But this statement was also too ambiguous to serve as a clear invocation of Ms. Davies's *Miranda* rights. Again, the agent attempted to clarify what Ms. Davies meant, asking "so basically you don't want to talk and you want an attorney right?"[51] Instead of expressing a desire to terminate the questioning, Ms. Davies continued asking the officers about whether she should obtain counsel.[52] Ms. Davies statement that she "can't say anything" could have referred to her difficulty formulating thoughts because she was "befuddled"—the statement was ambiguous and did not necessarily refer to Ms. Davies's right to remain silent. When the officers attempted to clarify this ambiguous statement, Ms. Davies then offered "I don't even know where to begin. I don't know what to say."[53] A reasonable officer would not interpret her verbal musings about whether she needed a lawyer, "where to begin," and not knowing "what to say" as an unambiguous assertion of her right to remain silent or to an attorney.

---

[50] ECF No. 93, at 6.
[51] ECF No. 97, at 11; Ex. 5, Tr. at 5.
[52] *Id.*
[53] Ex. 5, Tr. at 5.

Ms. Davies's statements following the first and second readings of her *Miranda* rights were not sufficiently unambiguous to meet the high standard under *Davis*. The government concedes that Ms. Davies's third statement, "Well I want both. I'd . . . I'll answer your questions but I want an attorney" was an invocation of her right to counsel.[54] Thus, we next turn to examine whether Ms. Davies reinitiated interrogation after asserting her right to counsel.

### B. Ms. Davies reinitiated communication with the officers after invoking her right to counsel.

After a suspect asserts her right to counsel, she is not subject to further interrogation unless she herself reinitiates conversations with the police.[55] "Initiation" does not mean any communication whatsoever—inquiries or statements relating to routine incidents of the custodial relationship, such as asking for a drink of water or to use the phone, "will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*."[56] But statements indicating "a desire for a generalized discussion about the investigation" are sufficient to reinitiate the conversation.[57] In *Bradshaw*, the Court held that a suspect reinitiated a conversation with police after invoking his right to counsel by asking "Well, what is going to happen to me now?"[58] The Court reasoned that such a statement "could reasonably have been interpreted by the officer as relating generally to the investigation."[59]

In this case, Ms. Davies reinitiated conversation with the officers after invoking her right to counsel. After the officers understood that Ms. Davies had invoked her right to counsel, they

---

[54] ECF No. 97, at 47–48.
[55] *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).
[56] *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).
[57] *Id.* at 1045–46.
[58] *Id.*
[59] *Id.*

informed her that "We can't talk to you. We can't talk to you."[60] Davies responded "Oh. Okay. Well let me talk to you then."[61] Agent Mickelsen interjected "No. Let's . . . ," but Ms. Davies continued "I don't know . . . if I can talk to you today do I go to jail?"[62] Ms. Davies showed an instant and unequivocal willingness to reinitiate a general discussion about the investigation by immediately saying "let me talk to you." And Ms. Davies's question "if I talk to you today do I go to jail?" was comparable to the *Bradshaw* suspect's question "what is going to happen to me now?"—both are statements indicating a desire for a discussion about the investigation rather than inquiries relating to the routine incidents of the custodial relationship. Ms. Davies reinitiated communication with the officers by demonstrating a continued interest in discussing the case even after invoking her right to counsel.

But even if a suspect reinitiates communications with the police after invoking her right to counsel, the burden "remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."[63] Thus, the final question for this court is if Ms. Davies validly waived her *Miranda* rights.

### C. Ms. Davies validly waived her *Miranda* rights because she did so voluntarily with awareness of the rights she was waiving.

To establish a valid waiver of *Miranda* rights, the government must prove by a preponderance of the evidence: (1) that the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was "made with a full awareness of the right being abandoned and the consequences of the decision to abandon

---

[60] Ex. 5, Tr. at 6.
[61] *Id.*
[62] *Id.*
[63] *Oregon v. Bradshaw*, 462, U.S. 1039, 1044 (1983).

it."[64] Waiver is only effective if the totality of the circumstances show both an uncoerced choice and the requisite level of comprehension.[65] Factors that weigh on whether a waiver was coerced include "the characteristics of the defendant, the circumstances surrounding the statements, and the tactics employed by the police."[66] The Tenth Circuit has identified the following as relevant factors:"[1] the suspect's age, intelligence, and education; [2] whether the suspect was informed of his or her rights; [3] the length and nature of the suspect's detention and interrogation; and [4] the use or threat of physical force against the suspect."[67] Coercion will not result in an involuntary waiver unless it is "such that the defendant's will was overborne."[68] Here, considering in the totality of the circumstances both Ms. Davies's background and the officers' conduct, Ms. Davies made a voluntary and knowledgeable waiver of her *Miranda* rights.

First, there is no evidence that Ms. Davies's age, intelligence, and education undermined her waiver of her *Miranda* rights. Nor does she contend that they did. Additionally, Ms. Davies's previous dealings with law enforcement suggest that she likely was knowledgeable about her *Miranda* rights. Suspects with prior experience in the criminal justice system are "more likely to have knowingly waived their *Miranda* rights because '[t]he concepts encompassed by *Miranda* are not foreign' to them."[69] Ms. Davies had previously been charged federally and cooperated with law enforcement.[70] The preponderance of the evidence demonstrates that Ms. Davies

---

[64] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[65] *Id.*; *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).
[66] *United States v. Toro-Pelaez*, 107 F.3d 819, 825–26 (10th Cir. 1997).
[67] *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010).
[68] *United States v. Guillen*, 995 F.3d 1095, 1123 (10th Cir. 2021) (quoting *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006)).
[69] *United States v. Goebel*, 959 F.3d 1259, 1269 (10th Cir. 2020) (quoting *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004)).
[70] Tr. at 6.

understood her *Miranda* rights based on her age, intelligence, and education and that she made her waiver "with a full awareness of the right being abandoned and the consequences of the decision to abandon it."[71]

Second, Ms. Davies was informed of her rights. In fact, the officers informed Ms. Davies of her *Miranda* rights three distinct times during the interrogation, and Ms. Davies affirmatively acknowledged her rights.[72] This factor supports a finding that Ms. Davies waived her *Miranda* rights knowingly and voluntarily.

Third, the length and nature of Ms. Davies's interrogation generally point toward Ms. Davies's *Miranda* waiver being knowing and voluntary. The interrogation only lasted approximately 15 minutes before Ms. Davies waived her rights.[73] Defendant argues that the nature of the interrogation indicates that the agents' conduct was coercive,[74] but it does not rise to that level. Courts have found that there is a wide swath of police conduct during an interrogation that does not amount to coercion. Generally, truthful assertions about the strength of evidence against a suspect do not support a finding of coercion.[75] Neither does stating accurate information about the potential of arresting a suspect's spouse.[76] Nor does a limited assurance to discuss lenience with the U.S. Attorney's Office.[77] In contrast, withholding a suspect's required

---

[71] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[72] Ex. 5, Tr. at 4, 5; Ex. 5, part 2, at 3.
[73] ECF No. 97 at 50.
[74] ECF No. 93, at 24.
[75] *See United States v. Varela*, 576 Fed. App'x 771, 777 (10th Cir. 2014).
[76] *See United States v. Ponce Muñoz*, 150 F. Supp. 2d 1125, 1134–36 (D. Kan. 2001).
[77] *See United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994); *United States v. Harrison*, No. 2:07-cr-53-DAK, 2008 WL 473561, at *3 (D. Utah 2008).

medication is police conduct that can rise to the level of coercion and invalidate a *Miranda* waiver or confession.[78]

Other circuits have found coercive conduct that invalidated a *Miranda* waiver when the officers "attempted to impose a penalty on [the invocation of *Miranda* rights]" by telling a suspect that he would be penalized if he exercised his rights and requested a lawyer.[79] It was also coercive for officers to tell a suspect that once he invoked his right to an attorney he would be completely precluded from cooperating with the investigation.[80] But emotional statements expressing frustration with a suspect's answers and stating that the agent was "trying to decide how much of a monster [the suspect] was" did not "transform the interview into a coercive environment."[81]

In this case, the officers' conduct and statements were not sufficiently coercive or threatening to make Ms. Davies's *Miranda* waiver involuntary. The officers did not deceive or mislead Ms. Davies. The officers' factual statements concerning the nature of the charge, the strength of the evidence against Ms. Davies, cooperating coconspirators, and pending civil actions against Ms. Davies properties were certainly seemingly intended to convince Ms. Davies to speak and cooperate with law enforcement. Indeed, the fact that Agent Mickelson outlined

---

[78] *Cf. McGregor v. Gibson*, 219 F.3d 1245, 1254 (10th Cir. 2000) (holding police behavior was not coercive where there was no evidence that police withheld medication in an effort to induce a confession) (citing *Greenwald v. Wisconsin*, 390 U.S. 519, 519-21 (1968) (per curiam), in which the police purposefully withheld high blood pressure medication).

[79] *Collazo v. Estelle*, 940 F.2d 411, 417 (9th Cir. 1991) (holding that the statement "Once you get a lawyer, he's gonna say forget it. You know, don't talk to the police. Then it might be worse for you" amounted to coercion).

[80] *United States v. Anderson*, 929 F.2d 96, 102 (2d Cir. 1991) (holding that an officer stating "this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us" was coercive).

[81] *United States v. Phillips*, 230 F. App'x 520, 524 (6th Cir. 2007) (unpublished). "[M]ere emotionalism" does not transform a voluntary interaction into a coercive one. *Id.* (citing *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988)).

cooperating witnesses twice at the beginning of the interview[82] and then methodically listed cooperating coconspirators after Ms. Davies had reinitiated questioning[83] is indicative of his intent to persuade Ms. Davies to talk. But that conduct alone is not enough to meet the high bar of "psychological coercion such that the defendant's will was overborne."[84] To the contrary, after the agent indicates that the government intends to seize her property and identifies all the cooperators against Ms. Davies by name, Ms. Davies then responds "I'm not sure what to do. What do you think? I'm not sure what to do. I'm really stunned." In short, while the agent's words appear to have had an effect on her, she still is deciding what she will do.[85] The preponderance of the evidence demonstrates that Ms. Davies's will was not overborne by Agent Mickelson's comments—instead, she evinced a desire to talk to agents throughout the interrogation, continually initiating conversation even as the officers attempted to stop the interrogation and clarify whether she had invoked her *Miranda* rights. The officer's repeated statements about cooperating witnesses and civil forfeiture actions were factual and not sufficient to rise to the level of coercion that would invalidate Ms. Davies's *Miranda* waiver.

Without cite to the record, defense counsel asserts that "Davies was visibly ill" during the interrogation.[86] Health conditions alone are generally not enough to invalidate a *Miranda* waiver.[87] There is no evidence that Ms. Davies was impaired during the interrogation. The

---

[82] Ex. 5, Tr. at 2.

[83] Ex. 5, Tr. at 8.

[84] *United States v. Guillen*, 995 F.3d 1095, 1123 (10th Cir. 2021) (quoting *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006).

[85] The court has reviewed the audio recording as well as the transcription. Ms. Davies' voice and verbal affect sound very similar throughout the interrogation. The court could detect no sign that Ms. Davies' will had been overcome at any point of the interrogation.

[86] ECF No. 93, at 12.

[87] *See United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (holding that a suspect who was in pain and hospitalized was nonetheless alert and voluntarily waived *Miranda* rights).

officers allowed Ms. Davies to take smoking breaks and use her inhaler.[88] The stress of the search and the interrogation certainly affected Ms. Davies, as she stated "I might have to take something else for anxiety,"[89] ". . . I'm mind boggled right now,"[90] and "I swear to God I'm gonna have a heart attack here."[91] But these statements of general stress are not enough to negate her *Miranda* waiver. Ms. Davies consistently engaged the officers with specific questions[92] and expressed a desire to speak with the officers about her side of the story.[93] She was aware of the situation and her stress did not impair her from understanding the three readings of her rights and her subsequent *Miranda* waiver.

Finally, the fourth factor in determining the validity of a *Miranda* waiver is whether the officers used or threatened physical force against a suspect. Here, the officers never used or threatened physical force against Ms. Davies.[94] This factor weighs in favor of finding that Ms. Davies's *Miranda* waiver was voluntary.

Ultimately, the totality of the circumstances demonstrates that Ms. Davies waived her *Miranda* rights by free and deliberate choice with an awareness of the rights she was abandoning. The officers read Ms. Davies her *Miranda* rights on three distinct occasions, and Ms. Davies affirmatively acknowledged that she understood her rights. Ms. Davies was not impaired during the interrogation and asked multiple clarifying questions. The interrogation did not go on for an unreasonable amount of time; it was only 15 minutes before Ms. Davies waived

---

[88] Ex. 5, Tr. at 1, 8.
[89] *Id.*, Tr. at 1.
[90] *Id.*, Tr. at 4.
[91] *Id.*, Tr. at 9.
[92] *Id.*, Tr. at 1 ("Are we under arrest today?"), 5 ("Well don't you think I should get an attorney?"), 6 ("If I can talk to you today do I go to jail?").
[93] *Id.*, Tr. at 6 ("Well let me talk to you then."), 7 ("I'm here to tell you my story").
[94] ECF No. 97 at 7.

Case 2:18-cr-00288-DBB   Document 102   Filed 08/23/21   PageID.448   Page 17 of 17

her rights. And the officers never made threats of physical force or raised their voices when talking to Ms. Davies. Ms. Davies's *Miranda* was knowing and voluntary; her subsequent statements will not be suppressed.

## ORDER

Because Ms. Davies validly waived her *Miranda* rights, the motion to suppress is DENIED.

Signed August 23, 2021.

BY THE COURT

David Barlow
United States District Judge